**UNITED STATES, Appellee,**

v.

**R.L.C., Juvenile Male, Appellant.**

**No. 90–5048.**

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 14, 1990.

Decided Sept. 12, 1990.

Rehearing and Rehearing En Banc Denied Dec. 18, 1990.

Katherian D. Roe, Minneapolis, Minn., for appellant.

Jeanne J. Graham, Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, and HEANEY and BRIGHT, Senior Circuit Judges.

HEANEY, Senior Circuit Judge.

R.L.C., a juvenile, appeals from the district court's finding of juvenile delinquency for involuntary manslaughter pursuant to 18 U.S.C. §§ 5031, 1112(b), and 1153. He also appeals from a sentence of three years detention in a federal juvenile correctional facility. We affirm the finding of juvenile delinquency but vacate R.L.C.'s sentence and remand to the district court for resentencing.

## BACKGROUND

R.L.C., 16, was charged in a one-count information with involuntary manslaughter on the Red Lake Indian Reservation for causing the death of LaTesha Lynn Mountain while driving a car in a reckless manner while intoxicated.

Following an evening of heavy drinking, R.L.C. and another juvenile, James White, Jr., stole a car on the Red Lake Reservation. Shortly after the car was stolen, a witness saw it rear-end a car driven by Deborah Garrigan while travelling east on Highway 1 in Red Lake. Mountain, Garrigan's daughter, died from head injuries she received when she was thrown from the back seat to the front seat of Garrigan's car during the accident. The stolen car was later found in flames in the woods southwest of the accident scene.

R.L.C. and White both admitted drinking, stealing the car, and driving it at some point during the evening. Both denied having driven the car, however, at the time the accident occurred. Three witnesses, including White, placed R.L.C. behind the wheel at or immediately before the time of the accident. R.L.C. stated that he was sleeping in the passenger seat when the accident occurred, and did not awaken until the car crashed and ignited in the woods.

Following a trial to the court, the district court found that R.L.C. had been driving the car while intoxicated and in a reckless manner at the time of the accident which caused Mountain's death and that this conduct constituted involuntary manslaughter within the meaning of 18 U.S.C. § 1112(a). The district court adjudged R.L.C. to be a juvenile delinquent under 18 U.S.C. § 5031.

At sentencing, the prosecution requested that R.L.C. receive the statutory maximum penalty for involuntary manslaughter under 18 U.S.C. § 1112(b), three years. The district court acceded to the request and sentenced R.L.C. to three years detention at the Missouri River Adolescent Center in Chamberlain, South Dakota. R.L.C. appeals.

## DISCUSSION

R.L.C. raises two issues on appeal. He claims that the evidence at trial was insufficient to prove beyond a reasonable doubt that he drove the car at the time of the accident. After carefully reviewing the record, we believe the trial testimony adequately supports the district court's finding

that R.L.C. was driving the car when the accident occurred. Accordingly, R.L.C.'s sufficiency of the evidence claim is without merit.

R.L.C. also claims that the district court erred in sentencing him to the three-year maximum statutory penalty for involuntary manslaughter when an adult sentenced for the same offense under the sentencing guidelines would have received a maximum sentence of only twenty-one months.

As a juvenile delinquent, R.L.C. was sentenced under 18 U.S.C. § 5037. Section 5037(c) states:

> The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may not extend—
> (1) in the case of a juvenile who is less than eighteen years old, beyond the lesser of—
> > (A) the date when the juvenile becomes twenty-one years old; or
> > (B) the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult[.]

18 U.S.C. § 5037(c)(1) (1988).

R.L.C. argues that the phrase "maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult" means the maximum sentence an adult could receive under the sentencing guideline for the same offense. Guideline section 2A1.4(a)(2) provides a base offense level of 14 for involuntary manslaughter caused by reckless conduct. At a criminal history category of I, a base offense level of 14 yields a sentencing range of 15–21 months. R.L.C. therefore argues that his sentence of three years violates 18 U.S.C. § 5037(c)(1)(B).

The government argues that "maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult" refers to the statutory maximum sentence for the particular offense committed. The maximum sentence for involuntary manslaughter under 18 U.S.C. § 1112 is three years. 18 U.S.C. § 1112(b) (1988). The government argues that R.L.C.'s three-year sentence is the same as the maximum term of imprison-

ment an adult could have received if convicted of the same offense, and that the sentence therefore is permitted under 18 U.S.C. § 5037(c)(1)(B).

Section 5037 provides no definition of "maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult." In light of this failure, we must determine the intent of Congress in enacting section 5037(c)(1)(B) to resolve its ambiguity. *See United States v. Jones*, 811 F.2d 444, 447 (8th Cir.1987).

In construing a statute to ascertain its drafters' intent, we look first to the language of the statute itself, then to its legislative history. *See Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984). As further aids in the determination of legislative intent, we may also properly consider a statute's subject matter, the object to be accomplished, the purpose to be served, the underlying policies, and the consequences of various interpretations. *Kifer v. Liberty Mut. Ins. Co.*, 777 F.2d 1325, 1332 (8th Cir.1985). An examination of all these factors persuades us that Congress did not intend juvenile delinquents ordinarily to be subject to penalties harsher than those received by adults convicted of the same offense.

Section 5037(c)(1)'s language expresses a preference for juvenile sentences which are the lesser of the period of time between sentencing and the juvenile's twenty-first birthday and "the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult." 18 U.S.C. § 5037(c) (1988). The phrase "if *the juvenile* had been tried and convicted as an adult" suggests that the sentencing court should focus on the actual maximum sentence the particular juvenile in question would have been subject to but for his age, considering those individualized, subjective factors that would be relevant to sentencing the same individual as an adult. Had R.L.C. been tried for and convicted of involuntary manslaughter as an adult, he would have been sentenced under the sentencing guidelines, which provide a maximum sentence of 21 months for

an individual with R.L.C.'s criminal history. The sentencing guidelines establish the permissible maximum and minimum sentence in all cases except those in which the sentencing court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence [above or below the guideline range]." 18 U.S.C. § 3553(b) (1988).

The sentencing guidelines themselves do not apply to individuals sentenced as juveniles. *See* United States Sentencing Commission, Questions Most Frequently Asked About the Sentencing Guidelines 1 (Nov. 30, 1988). Section 5037 provides, however, that after a finding of juvenile delinquency, the court should consider any pertinent policy statements promulgated by the Sentencing Commission in determining the disposition appropriate to the offense. 18 U.S.C. § 5037(a) (1988). Using the sentencing guidelines to fix the maximum sentence a juvenile delinquent could receive would serve as a guide to courts to eliminate unwarranted disparity between juvenile and adult sentences. Using the upper limit of the applicable guideline sentencing range as the maximum sentence a juvenile could receive thus would further section 5037(c)'s goal of avoiding harsher penalties for juvenile offenders than for similarly situated adults.

Section 5037's legislative history also suggests that Congress intended the "maximum term of imprisonment" in subsection (c)(1)(B) to be the maximum term the juvenile in question actually could have received if sentenced as an adult under the guidelines, rather than the statutory maximum sentence for the offense committed.

Section 5037(c)(1)(B) was amended as part of the Comprehensive Crime Control Act of 1984 (CCCA), the same legislation that authorized the establishment of the sentencing guidelines. *See* Pub.L. No. 98–473, Title II, 98 Stat.1976 (1984).[1] This legislation made sweeping reforms in the sentencing of both adult and juvenile federal offenders. The CCCA's sentencing reform policies and goals, when considered in conjunction with other changes the CCCA made in the disposition of juvenile offenders, persuade us that Congress did not intend the real time served by juvenile offenders to exceed the real time that would be served by adults convicted of similar crimes.

The CCCA sought to establish a comprehensive and consistent system of sentencing that would promote fairness by eliminating unwarranted sentence disparity. S.Rep. No. 225, 98th Cong., 2d Sess. 50–52, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3133–35; *see also* U.S.S.G. ch. 1, pt. A, Introduction 3 The Basic Approach (policy statement) (Congress' goals in sentencing reform were to achieve honesty, uniformity, and proportionality). Additionally, the legislation sought to promote certainty in sentencing by abolishing the parole system in federal law. *See* Pub.L. No. 98–473, Title II, § 218(a)(5), 98 Stat. 2027 (Oct. 12, 1984); S.Rep. No. 225, 98th Cong., 2d Sess. 56–58, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3239–41.

The CCCA's legislative history notes that the amended section 5037(c) "parallels the 1974 Act provision set forth in current law

---

1. The CCCA's legislative history states that: "[p]roposed 18 U.S.C. 5037(c) provides the maximum periods for official detention of a juvenile found to be a juvenile delinquent." S.Rep. No. 225, 98th Cong., 2d Sess. 155, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3338. The 1984 amendment to section 5037(c)(1)(B) differed slightly from the current version of the statute. A 1986 amendment, which took effect on November 1, 1987, deleted the words "by section 3581(b)" following the phrase "maximum term of imprisonment that would be authorized." *See* Pub.L. No. 99–646, § 21(a)(2) (1986) (cited in 18 U.S.C.A. § 5037 historical and statutory notes (West Supp.1990)). Section 3581(b), also enacted as part of the CCCA, sets forth the maximum authorized terms of imprisonment for nine classes of federal felonies and misdemeanors. 18 U.S.C. § 3581(b) (1988). The import of the 1986 amendment is that Congress reconsidered and rejected establishing these statutory maximum sentences as the maximum terms of imprisonment juvenile delinquents could receive. The language of the 1984 amendment also suggests that if Congress wished to subject juveniles to the maximum sentences authorized by particular statutes, it knew how to say so.

for juveniles under 18 at the time of the proceeding." S.Rep. No. 225, 98th Cong., 2d Sess. 155, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3338. Juveniles sentenced under the forerunner of current section 5037(c)(1)(B) were immediately eligible for parole. 18 U.S.C. § 5041 (1982) (repealed effective Nov. 1, 1987). The CCCA eliminated the possibility of parole for juveniles, meaning that each sentence imposed under section 5037(c)(1)(B) for offenses committed after November 1, 1987 represents the period of time the sentenced juvenile actually will be incarcerated. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 156, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3339 ("It is expected that the time set at the disposition hearing for a juvenile placed in the custody of the Attorney General pursuant to 18 U.S.C. 5037(b) will represent the real time to be spent by the juvenile in a manner similar to that for adult offenders under the bill.").

Under the law in existence prior to the CCCA, both juveniles and adults were subject to the statutory maximum sentence provided in the statute defining the offense. Both juveniles and adults were also eligible for parole; juveniles immediately on being sentenced, and adults after having served one-third of their sentences. *See* 18 U.S.C. §§ 5041, 4205 (1982) (repealed effective Nov. 1, 1987). After November 1, 1987, the effective date of the CCCA's sentencing reforms, adults were subject to the maximum sentences provided in the sentencing guidelines and were no longer eligible for parole. Juveniles were also no longer eligible for parole. The drafters of amended section 5037(c)(1)(B) intended its operation to parallel prior law. Accordingly, after November 1, 1987, juveniles sentenced under the amended statute should be subject to maximum, real time sentences no greater than those which adult offenders could receive under the sentencing guidelines.

Allowing a juvenile sentenced under section 5037(c)(1)(B) to remain subject to the pre-guideline statutory maximum penalty provided for the offense committed would produce juvenile sentences inconsistent with those received by adult offenders and

relatively harsher than those to which juveniles were subject before November 1, 1987. It seems unlikely that Congress would seek to reduce sentence disparity and to increase certainty by creating a system under which juvenile offenders would automatically become subject to the real time equivalent of pre-guidelines statutory maximum sentences while similarly situated adults would ordinarily be subject only to the maximum guideline sentence for the same offense.

Once the sentencing guidelines took effect, Congress intended the statutory maximum sentences prescribed in 18 U.S.C. § 3581(b), *see supra* note 1, to represent "the greatest period the Congress should allow a judge to impose for an offense committed under the most egregious of circumstances." S.Rep. No. 225, 98th Cong., 2d Sess. 114, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3297. Similarly, the guidelines were to reserve the upper range of the maximum sentence "for offenders who repeatedly commit offenses or those who commit an offense under particularly egregious circumstances." *Id.* The CCCA's legislative history notes that these statutory maximum penalties were "no more intended to indicate the actual sentence a judge is expected to impose in each case than are the analogous provisions of current Federal statutes that also customarily set forth only the maximum limit on the judge's discretion." *Id.*

The Senate Judiciary Committee was also critical of existing statutory maximum penalties, suggesting that they could contribute to disparity and unfairness in sentencing. *See id.* at 39, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3222 ("These maximums are usually prescribed with little regard for the relative seriousness of the offense as compared to similar offenses."); *id.* at 87, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3270 ("Current maximum penalties are set at very uneven levels, and some are so inconsistent with the relative seriousness of the offense that the Sentencing Commission will probably find it necessary to recommend some

amendments before sentencing guidelines are in place.").

These excerpts indicate that Congress intended statutory maximum penalties after the effective date of the sentencing guidelines to serve only as an upper limit on judicial discretion and to be applied to adults only in relatively rare and egregious circumstances. The guidelines' structure reflects this intent. For example, an adult convicted of involuntary manslaughter could be sentenced under the guidelines to the statutory maximum of three years imprisonment only if he had a criminal history category of V, representing the equivalent of four prior felony convictions.

Given the CCCA's goals of promoting consistency, uniformity, and fairness in sentencing and the relative disfavor in which its drafters held existing statutory maximum penalties, the interpretation of section 5037(c)(1)(B) which the government urges seems clearly wrong. If we were to adopt this construction, *any* juvenile adjudicated a delinquent for committing involuntary manslaughter could be sentenced to three years imprisonment with no possibility of parole. An adult convicted of the same offense, however, could receive the same sentence *only* if he had an extensive criminal record or if his commission of the offense included aggravating factors sufficient to increase his base offense level by five levels under the sentencing guidelines. *See* U.S.S.G. ch. 5, pt. A—Sentencing Table. Such disparate results seem particularly unreasonable in light of the guidelines' admonition that age is not ordinarily a factor relevant to decisions among sentencing options. *See id.* § 5H1.1 (policy statement).

■■ Rules of statutory construction also counsel against adopting an interpretation of section 5037(c)(1)(B) that would subject juveniles to the maximum statutory penalty for the offense committed. Criminal statutes must be strictly construed. *See Dowling v. United States,* 473 U.S. 207, 213, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985).[2] The rule of lenity states that a court cannot interpret a federal criminal statute "so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958). This principle of construction applies to sentencing provisions as well as to substantive criminal statutes. *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *Rowe v. Lockhart,* 736 F.2d 457, 461 (8th Cir.1984). The rule of lenity favors the statutory construction that yields the shorter sentence.

■ Section 5037(c)(1)(B)'s language and legislative history, the policies underlying federal sentencing reform, the consequences of the possible interpretations, and the rule of lenity require us to adopt the construction of the statute that subjects juveniles sentenced under it to the lesser penalty; in this case, the construction urged by R.L.C. We hold that the phrase "maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult" prohibits a court from sentencing a juvenile to a term of imprisonment greater than the juvenile could have received had he been sentenced as an adult under the sentencing guidelines.[3] This holding requires a partic-

---

**2.** Although an adjudication of juvenile delinquency under 18 U.S.C. § 5031 is a determination of status rather than a criminal conviction, *United States v. Frasquillo–Zomosa,* 626 F.2d 99, 101 (9th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980), the Federal Juvenile Delinquency Act entitles a juvenile to all rights that would be accorded an adult in a criminal prosecution except the right to a grand jury indictment. S.Rep. No. 93–1011, 93d Cong., 2d Sess. 38, *reprinted in* 1974 U.S.Code Cong. & Admin.News 5321. Because statutes imposing penalties on juvenile delinquents in-

volve deprivations of liberty similar to those attendant on criminal conviction, they should be construed no less strictly than statutes imposing criminal sanctions on adults.

**3.** Our holding conflicts with that of the Ninth Circuit in *United States v. Marco L.,* 868 F.2d 1121, 1124 (9th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989). We find that decision's reasoning unpersuasive for the reasons discussed above, and believe that its holding will lead to inequitable results incon-

ularized, subjective determination in each case of the upper limit of the appropriate guideline range. In cases involving aggravating circumstances not contemplated by the guidelines, a court sentencing a juvenile delinquent could make a finding that the prescribed guideline range did not adequately reflect the severity of the offense, and could deviate from that range accordingly.

## CONCLUSION

We vacate the sentence imposed by the district court and remand this case for re-sentencing consistent with this opinion.

sistent with the goals of federal sentencing reform.

The Ninth Circuit found persuasive language in 18 U.S.C. § 3559, which deals with the classification of federal offenses under the sentencing guidelines. Subsection (a) provides that offenses which do not contain a letter classification can be classified based upon the length of imprisonment authorized by the statute defining the offense. The *Marco* court points to section 3559(b), which is entitled "Effect of Classification," and states that "[a]n offense classified under subsection (a) carries all the incidents assigned to the applicable letter designation, except that the maximum term of imprisonment is the term authorized by the statute describing the offense." The *Marco* court reasoned that this language shows that "Congress has defined the 'maximum term of imprisonment' to be that term prescribed by the statute defining the offense." *Id.* at 1124. The sentence in section 3559(b), however, refers *only* to language in section 3559(a), and seeks to establish what no one contests: that no matter what letter classification an offense is given, the maximum term of imprisonment a judge can impose is the term listed in the statute defining the offense. Section 3559(b) was not meant to function as an overarching definition of "maximum term of imprisonment" for the entire federal criminal code.